297 So.2d 262 (1974)
Charles E. BRYANT, Plaintiff-Appellee,
v.
Calvin Dale McCANN, Defendant-Appellant.
No. 4572.
Court of Appeal of Louisiana, Third Circuit.
June 28, 1974.
*263 Neblett, Fuhrer & Broussard by Daniel E. Broussard, Jr., Alexandria, for defendant-appellant.
Holt, Wagner & Lee by Richard E. Lee, Pineville, for plaintiff-appellee.
Before HOOD, CULPEPPER and MILLER, JJ.
HOOD, Judge.
This is a tort action in which plaintiff, Charles E. Bryant, alleges that crops which he was raising on his truck farm were damaged by cattle owned by defendant. The defendant, Calvin Dale McCann, answered denying liability, and he reconvened seeking to recover damages from plaintiff for the alleged seizure or "wrongful conversion" of some of his cattle. The trial court rendered judgment awarding plaintiff $1,590.50 as damages and rejecting defendant's reconventional demand. Defendant appealed.
One issue presented is whether defendant is liable for the crop damages caused by *264 his cattle in this "open range" area. Another issue to be determined is whether defendant is entitled to recover damages from plaintiff for the alleged wrongful seizure, impounding or conversion of defendant's cattle.
Plaintiff Bryant owns a 24 acre tract of land in Rapides Parish on which he operates a truck farm. He plants and raises vegetables and similar crops on that property which he sells commercially. Plaintiff's property is enclosed by a fence. A part of that fence is constructed of 32 inch hogwire, with three strands of barbed wire on top, and the remainder is constructed of 39 inch hogwire, with two strands of barbed wire on the upper part of the fence. Ingress and egress to the property is provided by way of three double gates made of pipe, two single chain link gates, and two cattle guards.
On August 2, 1972, plaintiff's neighbor, Ralph Carpenter, saw four head of cattle in plaintiff's garden. He suspected that the cattle belonged to defendant, so he had a member of his family notify defendant of the fact that the cattle were in plaintiff's truck farm enclosure. Later that evening some men went to that location and chased the cattle out of plaintiff's garden.
Early on the morning of August 9, plaintiff noticed several cattle in his field. He thereupon went immediately to defendant's home, informed McCann of that fact and asked him to remove the cattle and to take steps to keep them out of his truck farm. Shortly thereafter, defendant and his brother went to plaintiff's property and drove the cattle out of his truck farm.
Later that same day, plaintiff's wife and children observed some cattle jump one of the cattle guards to get into plaintiff's pea patch. Defendant's wife and mother happened to be driving by plaintiff's property about that time, and defendant's wife assisted plaintiff's wife and children in chasing the cattle out of the truck farm enclosure.
On the morning of August 10, 1972, plaintiff's wife found several head of cattle bedded down among the vegetables in the truck farm. She immediately telephoned defendant's mother advising her of that fact and requesting that she have someone come and get the cattle out. Defendant thereupon came out and removed the cattle from plaintiff's property. Bryant then examined his crops and found that they had been damaged or partially destroyed by the cattle. He decided at that time to pen up any other cattle which got into his farm.
On August 12 plaintiff found one cow in his truck farm, and he put it in an enclosed pasture on his farm. On August 13 he penned up eight more cattle which he found in his garden, and on August 14 he penned up another one. Plaintiff contacted the Sheriff's Department in Rapides Parish immediately after enclosing these animals, and reported that he was holding them.
Defendant learned shortly after August 12 that plaintiff had penned up some of his cattle, and he contacted the Sheriff's office for assistance in getting the cattle returned to him. After some negotiations between counsel for the respective parties, plaintiff returned all of the cattle to defendant about three weeks after they had been penned up. The cattle were well fed and well cared for during the time they were penned up by plaintiff.
The evidence shows that all of the cattle which got into plaintiff's truck farm, and all of the cattle which plaintiff penned up, belonged to defendant. Mr. Carpenter, who lived near plaintiff, testified that the cattle which he saw in the truck farm were "Brahma" or "Mixed Brahma" cattle, and that defendant McCann was the only cattle owner he knew who was "running that type of cows in that area."
During the time all of the above mentioned incidents took place, there was no statute or ordinance which prohibited the roaming of cattle at large in the part of Rapides Parish where plaintiff's farm was *265 located. That area, therefore, is commonly referred to as an "open range" area.
The trial court found that defendant was liable to plaintiff for the damages to plaintiff's truck farm caused by defendant's cattle. Defendant, contending that the trial court erred, argues that he had the legal right to let his cattle roam at large in that part of Rapides Parish, since it was an "open range" area, and that he thus is free from fault. He also argues that plaintiff was under a duty to enclose his property with a fence adequate to keep out the ordinary run of cattle, if he wants to keep them out, and that he is barred from recovery in this case because of his contributory negligence in failing to maintain such a fence.
LSA-C.C. art. 2321 provides that: "The owner of an animal is answerable for the damage he has caused." Although the language used in that article indicates that absolute liability is imposed on the owner for damages caused by his animal, our jurisprudence is settled that the cited article must be read and considered with Article 2315 of the Civil Code, and that the owner is liable for damage done by the animal only in cases where he is chargeable with some fault or negligence. Fall v. Manual, 228 So.2d 494 (La.App. 3 Cir. 1969), and cases cited therein.
In "open range" areas, that is, in areas where there is no stock law or ordinance prohibiting an owner from allowing his animals to roam at large, the owner is under no duty to keep his domestic animals enclosed. In those areas the running of livestock at large is lawful, and if a property owner desires to keep such roaming stock off his property, it is his duty to enclose his land with a fence which is adequate to keep out the ordinary run of livestock. Parrott v. Babb, 15 La.App. 520, 132 So. 377 (La.App. 2 Cir. 1931); Morgan v. Patin, 47 So.2d 91 (La.App. 1 Cir. 1950); Williams v. Windham, 3 La.App. 127 (2 Cir. 1925); Fall v. Manual, supra.
In the instant suit, since plaintiff's property is located in an "open range" area, the burden of proof rests on plaintiff to show that the crop damage was caused by cattle owned by defendant, and also that plaintiff maintained a fence around his property which was adequate to "keep out the ordinary run of livestock." If plaintiff establishes those facts, then a legal presumption arises that the owner of the cattle was guilty of some fault or negligence in his ownership or possession of that stock, and unless he successfully rebuts that presumption he will be held to be liable for damages caused by his animals.
The evidence is uncontradicted in this case that defendant's cattle caused the damages which plaintiff sustained to his crop. The parties disagree, however, as to whether plaintiff maintained an adequate fence around his truck farm.
The evidence shows that the fence which surrounded plaintiff's truck farm was a substantial, well constructed fence, of the usual height. It was in good condition when the above mentioned incidents occurred, except that a section of the fence near a cattle guard had been knocked down in March, 1972, and had never been repaired. Defendant argues that because of this defect in the fence, the fence cannot be considered as being adequate to protect plaintiff's property. He also contends that the two cattle guards maintained by plaintiff were not adequate to keep out the ordinary run of livestock.
While it is true that a part of plaintiff's fence was knocked down before the cattle damaged his crops, the evidence shows that Bryant had temporarily repaired that defect in the fence by propping it up in such a manner that cattle could not get through it. That section of the fence remained in that temporary state of repair during all of the time the above mentioned incidents occurred, and there is no evidence that any cow ever entered or left the truck farm at that location, or that the fence at that *266 point failed to keep cattle out of plaintiff's property.
Each of the two cattle guards maintained by plaintiff was constructed of steel pipes, laid parallel to each other and several inches apart. Each cattle guard was about six feet wide and ten feet long. Defendant contends that the pits under these cattle guards had become filled in with dirt or other substances, so that they were only six to ten inches deep, and his cattle could walk across them. He testified that he saw some of his cattle walk across the cattle guard by stepping between the steel pipes, allowing each foot to rest on the bottom of the partially filled pit, and then withdrawing the foot from between the pipes before taking the next step. His testimony to that effect was not corroborated by any other evidence, and the trial judge rejected it. We agree with the trial judge that the cattle did not walk across these cattle guards. Several witnesses testified that they saw the cattle jump over the cattle guards in entering and leaving the truck farm area, and we believe that that is the way in which they entered plaintiff's property.
The evidence, including photographs of the cattle guards, convince us that the pits under the cattle guards were not filled up, and that the cattle guards were wide enough and were adequate to keep out the ordinary run of livestock.
One witness testified that he saw a cow jump over a fence on one occasion while Mr. and Mrs. Bryant were chasing it out of the garden. Bryant stated that he has never seen a cow jump the fence. In any event, the fact that a cow may have jumped the fence on one occasion does not establish that the fence was inadequate. It could be interpreted, with equal logic, as showing that that particular cow was not the ordinary run of livestock. The evidence shows that the fences were of the usual construction, and that they were high enough to prevent all cattle from jumping over them, except perhaps the one cow which we have just mentioned.
Mr. Carpenter testified that on August 2, 1972, when he first saw some cows in plaintiff's enclosure, he noticed that one of the gates was standing open. That testimony is disputed by plaintiff. Even if a gate had been left open on that occasion, however, there is no evidence tending to show that a gate was open on any of the other times when defendant's cattle entered plaintiff's property. No one saw a cow enter or leave the property through an open gate, and there is an abundance of evidence to show that several of defendant's cows jumped a cattle guard in order to enter or leave the farm property.
Our conclusion is that plaintiff has sustained the burden of proof which rested on him of showing that he maintained fences, including gates and cattle guards, which were adequate to protect his property from the "ordinary run of livestock." We conclude, therefore, that there was no error in the judgment of the trial court decreeing that plaintiff is entitled to recover damages from defendant.
The trial judge concluded that plaintiff sustained damages in the amount of $1,590.50. Defendant contends that plaintiff failed to prove his claim for damages to a reasonable certainty.
Generally, the amount of damage which should be awarded for the loss of a growing crop is the average yield and market value of crops of the same kind, planted and cared for in the same manner and in the same area, less the cost of marketing, harvesting and maturing the crop. The market value of such a crop is the price which the crop would have brought in a matured state at a sale in that community. Trahan v. Florida Gas Transmission Co., 208 So.2d 550 (La.App. 3 Cir. 1968), and cases cited therein.
We held in Trahan v. Florida Gas Transmission Co., supra, that the general rule could not be applied there because the *267 evidence did not establish the cost of marketing, harvesting and maturing the crop. Under those circumstances, we affirmed an award of the expenses which were shown to have been incurred by the plaintiff in cultivating the crop.
In the instant suit the trial judge found, correctly we think, that plaintiff had already expended the cost of planting and cultivating his crops, and that since they were ready to be harvested when damaged, plaintiff was entitled to recover the amount which he would have received for them had the damage not been sustained. Plaintiff harvested the crops which remained after the damage, so he incurred the same expense of harvesting which would have been incurred had the crops not been damaged.
In his reasons for judgment, the trial judge analyzed the evidence relating to each type of crop raised by plaintiff, and he computed the loss which was sustained on each crop. He itemized the crop damages as follows:

 Corn crop $200.00
 Pea crop 412.00
 Cucumber crop 230.00
 Watermelon crop 260.00
 Squash crop 184.00
 Strawberry crop 304.50
 _________
 Total $1,590.50

In making those computations, the trial judge determined the average yield which plaintiff had obtained in prior years for the same types of crops, raised in the same place and in the same manner. He then determined the market value of his 1972 crops, computed according to the method set out in the Trahan case, supra. We think the trial judge was conservative in determining the average yield and market value of most of those crops.
We find no error in the method used by the trial judge in determining the loss sustained by plaintiff. We believe that he erred, however, in concluding that the damages to plaintiff's pea crop was $412.00. Although there is evidence which might support that award, plaintiff himself estimated his damages to the pea crop to be only $272.00. We think the award made to plaintiff, therefore, should be reduced by $140.00, that being the difference between the above mentioned figures.
Defendant points out that plaintiff did not report any farm income on his income tax returns for the past three years. He contends that that establishes that plaintiff had received no income from his truck farming operations, and that he thus sustained no loss as a result of the damages to his 1972 crops. Evidence to the effect that plaintiff did not report any farm income in his prior income tax returns is material evidence which should be considered along with the other evidence presented in determining what his earnings have been or might have been. The fact that he made no such returns, however, does not prove conclusively that he failed to receive any income from his truck farming operations. We think the evidence, considered as a whole, establishes that he did sustain the losses found by the trial court, except for the error which we have mentioned. The question of whether he should have reported his truck farm earnings in his income tax return is not before us.
We turn now to defendant's reconventional demand for the damages he allegedly sustained as the result of the impounding of his cattle.
The ten cattle which plaintiff penned up for several days were cows which had entered his truck farm enclosure, despite the fact that he had maintained an adequate fence around that farm. These cattle were put in an enclosed pasture on plaintiff's property, and were well cared for until plaintiff returned them to the defendant about three weeks later. Defendant contends that this constitutes an unlawful conversion of the cattle, for which an action for damages arises, and that he is entitled *268 to recover damages because of the humiliation, embarrassment and inconvenience which he suffered. He relies primarily on the cases of Edwards v. Max Thieme Chevrolet Co., 191 So. 569 (La.App. 2 Cir. 1939) and Bostwick v. Avis Rent-A-Car, 215 So.2d 854 (La.App. 1 Cir. 1968).
In Lincecum v. Smith, 287 So.2d 625 (La.App. 3 Cir. 1974), we held that "Conversion is a distinct act of dominion wrongfully exerted over another's property in denial of or inconsistent with the owner's rights therein."
In Edwards v. Max Thieme Chevrolet Co., supra, the Court of Appeal, Second Circuit, held that in order for there to be a conversion, "the act must be essentially tortious." In the Bostwick case, supra, the Court of Appeal, First Circuit, held that the conversion of the property of another is a tort. Damages were awarded in that case because the property was wrongfully converted to force plaintiff to pay for a car.
We have concluded that the penning up or detention of defendant's cattle in this case did not constitute a "wrongful conversion" of the cattle. Plaintiff was entitled to protect his crops from damage by the cattle. Experience had demonstrated that the crops could not be protected by simply driving the cattle out of the farm enclosure. We think the measure taken by plaintiff to protect his property was reasonable and was justified. We thus affirm that part of the trial court judgment which rejects defendant's reconventional demand for damages based on the alleged wrongful conversion.
For the reasons assigned the judgment appealed from is amended by reducing the amount of the award from $1,590.50 to the sum of $1,450.50. In all other respects the judgment appealed from is affirmed. The costs of this appeal are assessed to defendant-appellant.
Amended and affirmed.